[Crim. No. 20786. Apr. 11, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD EARL DIXON, Defendant and Appellant.

## Counsel

Thomas F. Maxwell, Jr., under appointment by the Supreme Court, and O'Gara, Friedman, Egenes & Burke for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., Derald E. Granberg and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MANUEL, J.**—Defendant Ronald Earl Dixon appeals from a judgment convicting him of murder in the first degree (Pen. Code, §§ 187, 189), and sodomy by force or violence (Pen. Code, § 286, subd. (d)), and sentencing him to state prison for the term prescribed by law. We affirm.

A brief statement of the facts of this case will be sufficient for present purposes. In the early hours of February 5, 1977, defendant and Rosalind Thomas were driving about in Mountain View when they came upon a woman dressed in a housecoat and standing in water coming from a broken main. They stopped, and defendant asked the woman whether she needed a ride; she replied only that her apartment was on fire. Defendant ultimately succeeded in persuading the woman, whose speech and conduct were indicative of mental derangement, to enter the back seat of the car, where he joined her. After Rosalind had driven some distance defendant announced his intention to perform an act of sodomy upon the woman; he proceeded to do so. When Rosalind could not find an address which the woman had mentioned, she drove to defendant's apartment, where he dragged the woman out of the car and took her inside and into a bedroom; Rosalind drove off to pick up defendant's brother at a nearby cafe.

Allison Murphy, who had been sleeping in the apartment, then heard incoherent screaming issuing from the bedroom, and when defendant emerged briefly she asked him what the woman was doing there; defendant replied, "I am going to kick the bitch's ass." Allison asked why he was going to do that and he replied to the effect that she was "being smart" with him. Allison then entered the bedroom to get her purse and saw the woman sitting in a corner on the floor, naked, with her hands

behind her back and her eyes closed. Allison returned to the living room and shortly thereafter defendant returned to the bedroom carrying a roll of tape. The woman had been talking loudly and incoherently, repeating the word "marijuana" and spelling the name "Clarence," but soon after defendant reentered the bedroom with the tape the talking ceased and only a muffled sound was heard.

After approximately 30 minutes had passed, defendant remaining in the bedroom with the woman while Allison waited in the living room, Rosalind arrived with defendant's brother Ernest and another woman, Debra Perry. Defendant, who was now wearing black leather gloves, again emerged from the bedroom and, after again announcing that he was going to "kick her ass," returned to the bedroom to pick up the woman and bring her into the living room. She was nude, her hands were tied behind her back, and her head was covered with a blood-stained cloth bag. When defendant lifted up the bag, revealing the woman's bloodied face and her mouth covered by tape, Rosalind and Allison began crying and retreated to the bedroom. Shortly thereafter they heard thumping sounds emanating from the living room and a man's voice saying "She has to go." Ernest then entered the bedroom and, securing an electrical cord from the radio, proceeded to tie it around the woman's throat; her ankles were then tied with a shoelace. The two men carried the body from the apartment, but after they encountered a neighbor in the hallway Ernest refused to help any further. Defendant later returned to the apartment, where he stated that he had put the body in the creek and cautioned the women that if they talked about what had occurred they would "get the same thing just like her."

The body of the woman, Rosemary MacDonald, was discovered in the creek bed later that morning. A duffle bag was secured over the head and upper part of the body with knots at the waist and neck. When the bag was removed it was found that the mouth had been stuffed with a dishcloth and taped shut. Subsequent pathological examination revealed that death had been caused by asphyxiation, largely the result of the insertion of the dishcloth, which blocked the victim's air passages. The rectum was dilated and contained sperm. A search of defendant's apartment disclosed the radio from which the electrical cord found tied around the victim's neck had been cut; also found were a roll of tape matching that used on the victim's mouth and wrists and a shoe from which the lace securing her ankles had been removed.

Defendant's primary contention relates to the instructions given to the jury with respect to the degrees of murder, and with the court's response to a question put by the jury to it after the commencement of deliberations regarding the application of those instructions.

The jury was instructed on the degrees of murder in the terms of CALJIC (3d rev. ed. 1970) Nos. 8.70, 8.71 and 8.74 (1976 Rev.).[1] After approximately two and one-half days of deliberations the jury through its foreperson sent a communication to the court which propounded the following question: "If we have unanimously agreed that the verdict is murder, but cannot agree unanimously that it is first degree murder, do we have to have a unanimous second degree vote? (ref. instruction #47 [CALJIC No. 8.71] and #49 [CALJIC No. 8.74 (1976 Rev.)]." Returning the jury to the courtroom the court answered the question as follows: "The answer to the question, Mrs. Funderburg [foreperson], is yes." The jury thereupon retired to continue its deliberations.

Approximately two hours later, at the conclusion of the third full day of deliberations, the court again called the jury to the courtroom and the following colloquy occurred: "THE COURT: . . . Mrs. Funderburg, the Court is going to at this time address some questions to you as the foreperson of the Jury, and I would ask that you cooperate with the Court in the following fashion: Please answer only the question that I ask you and do not volunteer any information, and I will ask the first question. Has the Jury reached a verdict as to any defendant? THE FOREPERSON: Yes. THE COURT: Has the Jury reached a verdict as to more than one defendant? THE FOREPERSON: No. THE COURT: The previous communication to the Court was that, 'The Jury has unanimously agreed upon a verdict of murder but cannot agree unanimously that it is in the first degree. Do we have to have a unanimous second degree vote,' and the Court answered the question yes. The Court inquires at this time as to whether or not the disagreement of the trial jury is as to the degree of

---

[1] The instructions given provided: "Murder is classified into two degrees, and if you should find the defendant guilty of murder, it will be your duty to determine and state in your verdict whether you find the murder to be of the first or second degree." (CALJIC No. 8.70.)

"If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give to such defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." (CALJIC No. 8.71.)

"Before you may return a verdict in this case, you must agree unanimously not only as to whether a defendant is guilty or not guilty, but also, if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree or involuntary manslaughter." (CALJIC No. 8.74 (1976 Rev.) as modified by the court.)

murder? THE FOREPERSON: Yes. THE COURT: Your answer is yes? THE FOREPERSON: Yes. THE COURT: Is it your informed opinion that as to the degree of murder as to any defendant, that the Jury is hopelessly deadlocked as to the degree only? THE FOREPERSON: No. THE COURT: It's your feeling, then, that if the Jury continues to deliberate, that the Jury then can reach a verdict as to all defendants as to all counts? Is that correct? THE FOREPERSON: Yes." The court then recessed for the day, ordering that deliberations continue the following morning.

The following day, at 3:15 p.m., the jury returned its verdict, finding defendant guilty of murder of the first degree and sodomy by force and violence.[2]

■ Defendant urges that the trial court, in answering the question put by the foreperson of the jury (see text following fn. 1, *ante*), misstated the law. Relying on the case of *Stalcup* v. *Superior Court* (1972) 24 Cal.App.3d 932 [101 Cal.Rptr. 467] and the interpretation placed therein on section 1157 of the Penal Code, he argues that instead of impressing on .the members of the jury that any verdict returned by them was required to be unanimous not only as to offense but as to degree, the court was required under the law to inform them that upon their failure to reach unanimity on the question of degree, a verdict of second degree would follow as a matter of law. The prejudice inherent in this misstatement, defendant concludes, was in no way dispelled by the deliberations undertaken by the jury following it, or by the fact that a unanimous verdict was ultimately reached, because such deliberations and verdict took place following the occurrence of a deadlock as to degree, which should as a matter of law have led to a second degree verdict.

We disagree on two grounds. First there is no admissible evidence in the record to indicate that the members of the jury had reached a state of deadlock on the question of degree at the time of the subject inquiry and response. Indeed, the hypothetical form of the question presented to the court, together with the colloquy we have set forth which occurred after two hours' further deliberation, would strongly indicate to the contrary. Secondly, we believe that even if it appeared that the jury had reached a state of deadlock on the question of degree, the result contended for by defendant is not supported by a proper interpretation of the law.

---

[2]Defendant had also been charged with rape. (Pen. Code, § 261, subds. 1 and 3.) The jury found him not guilty of this offense. His codefendant Ernest Dixon was found guilty of being an accessory, and Debra Perry, also a codefendant, was acquitted of all charges.

Section 1157, as amended in 1949 and 1951 provides: "Whenever a defendant is convicted of a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime of which the defendant is guilty, shall be deemed to be of the lesser degree."[3] Defendant, relying on the case of *Stalcup* v. *Superior Court, supra,* 24 Cal.App.3d 932, urges that this section requires that the court, upon being informed that the jury has agreed that the defendant is guilty of a crime distinguished into degrees but is unable to agree on the degree, must enter verdict and judgment in the lesser degree. In the cited case the jury, after deliberating for an unstated period of time, informed the court that it had unanimously agreed that the defendant was guilty of murder but that it was " 'not going to be able to come to any unanimous decision' " (24 Cal.App.3d at p. 934) on the question of degree. The court, after discussing the matter with counsel and determining that the jury stood eight to four on the question of degree, thereupon declared a mistrial and excused the jury. When a date was set for a new trial the defendant sought a writ of prohibition or mandate, urging that it was error to declare a mistrial because under the terms of section 1157 it was the duty of the court, in view of the fact of its unanimous agreement as to murder but its failure to agree as to degree, to fix the degree at second degree and render judgment. The Court of Appeal agreed, concluding that the jury had declared its unanimous verdict of murder and that, because "[t]he jury did not fix the degree and . . . were unable to agree on it, section 1157 came into play and fixed the degree at second degree, the lesser degree." (24 Cal.App.3d at p. 936.) Accordingly, a peremptory writ was issued directing the trial court to set aside its order granting mistrial and setting the case for a new trial and to enter a judgment of conviction of murder in the second degree.

As suggested above, we believe that the *Stalcup* case may be distinguished from that at bench in that whereas there the jury was agreed that it would not be able to come to a unanimous decision on the matter of degree, in the instant case the record reflects no such agreement. We also believe, however, that the interpretation placed upon section 1157 in the *Stalcup* decision is incorrect.

---

[3]A similar provision appears in section 1192 of the Penal Code: "Upon a plea of guilty, or upon conviction by the court without a jury, of a crime distinguished or divided into degrees, the court must, before passing sentence, determine the degree. Upon the failure of the court to so determine, the degree of the crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

Section 1157 of the Penal Code, as originally adopted in 1872 provided simply: "Whenever a crime is distinguished into degrees, the jury, if they convict the defendant, must find the degree of the crime of which he is guilty." The section was based on the Crimes and Punishment Act of 1850 (Stats. 1850, ch. 99, § 21, p. 231), which as amended in 1856 (Stats. 1856, ch. 139, § 2, p. 219) provided in pertinent part that "the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree. . . .." In a number of early cases applying these statutes it was held that a verdict rendered with respect to a crime distinguished into degrees which did not make a finding of degree must be set aside, the judgment entered thereupon reversed, and the defendant remanded for a new trial. (See, e.g., *People* v. *Marquis* (1860) 15 Cal. 38; *People* v. *Campbell* (1870) 40 Cal. 129; *People* v. *Travers* (1887) 73 Cal. 580 [15 P. 293]; *People* v. *Lee Yune Chong* (1892) 94 Cal. 379 [29 P. 776]; *In re Colford* (1924) 68 Cal.App. 308 [229 P. 63]; *People* v. *Brown* (1945) 69 Cal.App.2d 602 [159 P.2d 686].)[4] These cases all involved situations in which the jury had failed to fix the degree of the crime as a result of inadvertence or in circumstances indicating that an act of leniency was intended. (For an instance of the latter see *People* v. *Campbell, supra,* 40 Cal. 129, 140-141.) None involved a situation in which the jury had declared itself unable to agree on the matter of degree.

In 1949, section 1157 was amended to add a second sentence providing: "Upon the failure of the jury to so determine, the degree of the crime of which the defendant is guilty, shall be deemed to be of the lesser degree."[5] The statute was amended to its present form in 1951.

██ Although our research has disclosed no legislative materials expressly indicating the intent of the lawmakers in undertaking the 1949 amendments to sections 1157 and 1192, it is manifest that our search for such intent must proceed in light of the decisional background against which the Legislature acted. (See *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659-660 [147 Cal.Rptr. 359, 580 P.2d 1155], and cases there cited.) ██ That background, as we have pointed out, was made up wholly of cases in which the "failure" of the jury to determine the degree of crime consisted

---

[4]For similar cases decided under the preamendment version of section 1192, see: *People* v. *Jefferson* (1877) 52 Cal. 452; *People* v. *Paraskevopolis* (1919) 42 Cal.App. 325 [183 P. 585]; *In re Hammond* (1937) 24 Cal.App.2d 18 [74 P.2d 308].

[5]Section 1192 underwent a similar amendment at the same time.

in an omission to perform that function because of mistake or inadvertence or in circumstances suggesting an intended act of leniency. It did not include any case in which such "failure" resulted from an express inability to reach agreement on the question of degree—a fact which is readily understandable in light of the provisions of section 1140 of the Penal Code, which has provided since 1872 (and whose predecessors have provided since 1850—see Stats. 1850, ch. 119, § 440, p. 307; Stats. 1851, ch. 29, § 410, p. 256) that the court may declare a mistrial and discharge the jury when "it satisfactorily appears that there is no reasonable probability that the jury can agree." (See also Pen. Code, § 1141.) ■ We may therefore justly infer that the 1949 Legislature, amending the existing provisions of section 1157 in light of their judicial construction, used the word "failure" solely in the sense of omission to perform and not in the alternative sense of inability to achieve success.[6] If it had intended to convey the latter meaning as well, we think it clear that it would have at the same time undertaken an appropriate alteration of the mistrial provisions (Pen. Code, §§ 1140, 1141), which of course it did not do.[7]

■ We conclude that the Legislature, in enacting the 1949 amendment to section 1157 of the Penal Code, must be deemed to have intended that its provisions should apply only to situations in which the jury has neglected to fix the degree, and not to situations in which express disagreement among the members of the jury on the matter of degree has precluded it from achieving unanimity.[8] A contrary conclusion would not only offend against the established principles of statutory interpretation which we have applied, but it would also lead to what we deem to be absurd results, in which a clear minority favoring a lesser degree could effectively prevail over a clear majority favoring the greater degree. We decline to adopt such an interpretation.

---

[6] Webster's Third New International Dictionary (1961), at page 815, gives seven meanings for the word "failure," of which only the first two here concern us. They are: (1) "omission of performance of an action or task; *esp*: neglect of an assigned, expected or appropriate action" or "the fact of a certain action or process not having occurred . . . ," and (2) "want of success [or] lack of satisfactory performance or effect."

[7] Our understanding of the meaning to be accorded the 1949 amendment to sections 1157 and 1192 has earlier found expression in several recent opinions of this court. (See especially *People* v. *Hunt* (1977) 19 Cal.3d 888, 894-896 [140 Cal.Rptr. 651, 568 P.2d 376]; see also *People* v. *Beamon* (1973) 8 Cal.3d 625, 629, fn. 2 [105 Cal.Rptr. 681, 504 P.2d 905]; *In re Candelario* (1970) 3 Cal.3d 702, 706 [91 Cal.Rptr. 497, 477 P.2d 729].)

[8] We express no present opinion on—nor do the facts of this case require us to consider—the constitutional validity of the 1949 amendment to section 1157 under the limited interpretation we have given it.

To the extent it is inconsistent with the foregoing, the case of *Stalcup* v. *Superior Court, supra,* 24 Cal.App.3d 932, is disapproved.

It is clear from what we have said that the trial court correctly advised the jury, in response to the foreperson's question, that a unanimous finding by it on the question of degree was required under the law. Manifestly, therefore, we must also reject defendant's contention that the court was required to instruct the jury in the terms of section 1157 that upon failure to agree on the matter of degree it was incumbent that it return a second degree verdict. Moreover, and even if this contention were not contrary to the law as we have explained it, it contemplates an instruction which would constitute an open invitation to a juror favoring the lesser degree to have his way by simply adhering to his opinion in spite of any arguments which might be raised by his fellow jurors against it. If "[c]larity . . . does not require a broad hint to a juror that he can hang the jury if he cannot have his way . . ." (*Andres* v. *United States,* (1948) 333 U.S. 740, 766 [92 L.Ed. 1055, 1070, 68 S.Ct. 880] (conc. opn.); see also *People* v. *Gainer* (1977) 19 Cal.3d 835, 852 [139 Cal.Rptr. 861, 566 P.2d 997]), clearly it would not require advice to him that he might have his way by hanging the jury. Thus, even if the law were that a disagreement among the members of the jury on the matter of degree required the entry of a judgment in the lesser degree—which as we have explained it is not—the instruction which defendant contemplates would not be a proper one.

Of defendant's remaining contentions only one merits present comment by us. It is urged that the trial court erred in denying his motion for mistrial based upon the grounds (1) that Rosalind Thomas and Allison Murphy, who testified for the prosecution under unconditional grants of immunity, had discussed their testimony together, and (2) that the two women testified under the mistaken impression that in order to avoid prosecution their testimony at trial was required to be consistent with that given by them before the grand jury. The record reveals, however, that defendant withdrew his motion insofar as it was based on the first ground, and in any event the trial court correctly concluded upon considering the matter that the testimony of the two witnesses was sufficiently inconsistent to negate the possibility of an agreement between them. The second ground of the motion for mistrial was also not well taken, for the grants of immunity here involved were unconditional (cf. *People* v. *Medina* (1974) 41 Cal.App.3d 438, 449-456 [116 Cal.Rptr. 133]) and the trial court properly concluded that both the witnesses and the jury understood them to be so.

The remaining contentions advanced are clearly devoid of merit and we reject them without discussion.

The judgment is affirmed.

Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., Newman, J., and Caldecott, J.,* concurred.

Appellant's petition for a rehearing was denied May 10, 1979. Bird, C. J., did not participate therein.

*Assigned by the Acting Chairperson of the Judicial Council.